UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANITA CHIOKE,

                              Plaintiff,

                                                    **MEMORANDUM & ORDER**

        – against –

THE DEPARTMENT OF EDUCATION OF THE          15-cv-01845 (ERK) (CLP)
CITY OF NEW YORK, THE BOARD OF
EDUCATION OF THE CITY SCHOOL
DISRICT OF THE CITY OF NEW YORK,
AIMEE HOROWITZ, individually and on behalf
of the Department of Education of the City of
New York, and NEIL MONHEIT, individually
and on behalf of the Department of Education of
the City of New York,

                              Defendants.

Korman, *J*.:

        Plaintiff Anita Chioke, a black woman of Liberian national origin, sued the New York

City Department of Education ("DOE"), Aimee Horowitz, and Neil Monheit, alleging violations

of Title VII of the Civil Rights Act of 1964, as well as Section 1981. *See* Am. Verified Compl.

pp. 7–9, ECF No. 1. Chioke also named as a defendant the Board of Education of the City

School District of the City of New York, which essentially is just another name for the DOE.

Chioke argues that the defendants discriminated against her on the basis of her race and national

origin when they took various adverse employment actions against her, including giving her an

unsatisfactory performance rating for the 2013–14 school year and discontinuing her as an

Assistant Principal. She also claims that the defendants retaliated against her and subjected her to

a hostile work environment. The DOE now moves for summary judgment on all claims.

**Background**

Anita Chioke has worked for the DOE since at least September 2003. Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 1, ECF No. 31-4. In December 2011, Jimmy Molina, the Principal of the DOE's Foundations Academy, hired Chioke as his Interim Acting Assistant Principal. *Id.* at ¶ 14. The two knew each other from the DOE's Jane Addams High School, where Chioke had been a guidance counselor and Molina had been Assistant Principal. *Id.* at ¶ 3.

Shortly after Chioke arrived at Foundations, Aimee Horowitz became the Superintendent of DOE District 14, in which Foundations was located. *Id.* at ¶ 17. Chioke, a black woman of Liberian origin, alleges that at some point in spring 2012 and on later occasions, Molina, a Hispanic man, told her that he had the "firm belief" that Horowitz is a racist, "did not like minorities," and would cause the removal of both of them from Foundations. *Id.* at ¶¶ 2, 4, 18. Molina, however, later testified that, although he had told Chioke that he thought Horowitz was difficult to work with, he never said that she was racist, that she dislikes minorities, or that she thought Chioke should not be an Assistant Principal because of her African identity. *Id.* at ¶ 39.

In any event, Chioke interviewed in May 2012 to be a permanent Assistant Principal at Foundations. *Id.* ¶ 19. She got the job in January 2013, retroactive to September 24, 2012, and with a probationary period through December 19, 2016. *Id.* at ¶ 22. Despite receiving this position, Chioke now alleges that Molina, at Horowitz's instruction, limited her duties and supervision of staff for the 2012–13 school year. *Id.* at ¶ 21. She also claims that, during that year, Molina directed her to give the school's guidance counselor, who is African-American, an unsatisfactory rating. Pl.'s Decl. ¶ 13, ECF No. 31-11. Chioke alleges that she refused to do so, even though Molina threatened to give her an unsatisfactory rating too. *Id.* Still, when the 2012–13 school year ended, Molina recommended—and Horowitz approved—Chioke's continued

service as Assistant Principal. Pl.'s Resp. to Def.'s 56.1 Statement ¶¶ 23, 24. Molina also gave her a "satisfactory" performance rating for the year, as he had done the previous year. *Id.* at ¶¶ 20, 23.

But all was not well at Foundations. On November 12, 2013, Molina emailed Chioke, stating that the school's attendance rates for September and October were at "an unacceptable low number," and asking her to provide, by November 15, the minutes and supporting documents from certain attendance meetings, along with "the memos written to the staff to correct this rate." *Id.* at ¶ 25; Def.'s Decl. in Supp., Ex. R, ECF No. 31-3 at 103. On November 18, Molina sent Chioke a follow-up email, stating that he still had not received the requested documents. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 26; Ex. R. Chioke responded the next day, explaining that the "attendance binder was near completion," that one of the staff members working on it "has been out a lot due to personal issues," and that "[h]opefully, it will be done today or tomorrow." Ex. R. In that same email, Chioke also explained that she had discussed the low attendance problem repeatedly at monthly meetings, and she reminded Molina that, at a meeting held on November 15 to discuss the school's "F grade," he had attributed the declining attendance and enrollment "to the violent condition" of the school's location. *Id.* Molina responded: "I would like to see the documentations ASAP." *Id.*

The next morning, Chioke emailed Molina to let him know the binder was ready. *Id.* She also noted that Molina was aware that the school's guidance counselor had told them "that many parents were removing their children from Foundations Academy because of the violence in the area and also the school [sic] previous grade of an F." *Id.* A few hours later, Molina instructed Chioke to attend a meeting with him the next week to discuss "the low attendance rate that Foundations is experiencing," and he strongly suggested that she bring union representation. *Id.*

The two met on November 27, and despite Molina's suggestion, Chioke did not bring union representation. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 29.

A couple of months later, Molina wrote Chioke a letter. *Id.* at ¶ 30; Def.'s Decl. in Supp., Ex. S, ECF No. 31-3 at 105. It is not clear when Molina wrote the letter, but on January 24, 2014, Chioke signed the letter, indicating receipt and acknowledging that it would be placed in her file. *See* Ex. S. In the letter, Molina noted Foundations' falling attendance rates, as well as Chioke's late and incomplete submission of requested documents. *Id.* The letter further criticized Chioke for not initiating any course of action to deal with the low attendance rates, for not providing evidence that calls were made to parents, for failing to interpret the attendance data, and for showing "poor leadership qualities." *Id.* Observing that the school was "experiencing a further decline in student attendance," the letter concluded "that efforts to improve attendance have not been carried out, with any level of success." *Id.* Molina reminded Chioke of her "obligation as a professional to adhere to [her] scheduled program, follow [his] supervisory directions and address [him] in a professional manner." *Id.* And he advised "that this incident may lead to further disciplinary actions including as [sic] unsatisfactory rating." *Id.*

In response, Chioke penned a five-page rebuttal letter to Molina, dated February 3, 2014, which she also forwarded to Horowitz. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 31; Def.'s Decl. in Supp., Ex. T, ECF No. 31-3 at 107; Horowitz Dep. 52:3–53:3 (Pl.'s Ex. C); Pl.'s Decl. ¶ 15. In a surprising twist, Chioke wrote that, when she and Molina met on November 27, they did not actually discuss the school's low attendance rates. Rather, according to Chioke, Molina called her in to tell her that Horowitz had asked him to get rid of her by putting a letter in her file. Def.'s Decl. in Supp., Ex. T. And according to Chioke, Molina stated at the meeting that Horowitz "is just a plain racist," and that "when she comes here, she says the worst things about

all the black teachers and find [sic] everything nice to say about the white teachers." *Id.* In the

letter, Chioke accused Molina of "constantly undermining [her] especially with staff that [she]

supervise[s]," and she also wrote that, "on several occasions," Molina visited one of the

teachers—Mr. Ahmed—in his classroom "and told him to encourage [Chioke] to resign because

Mrs. Aimee Horowitz does not like [Chioke]." *Id.* Chioke noted that she "intend[s] to pursue this

case with the E.E.O.C.," and she "consider[s] it to be 'Persistent Harassment'." *Id.* Turning to the

school's attendance, Chioke averred that she has "worked very hard" to improve it and that,

when she was considered for the permanent Assistant Principal job, Molina had told higher-ups

that "attendance under [Chioke's] leadership has improved tremendously." *Id.* And finally, after

defending her record on school attendance, Chioke accused Molina of engaging in various types

of misconduct. *Id.*

On February 6, 2014, three days after Chioke dated her rebuttal, Molina sent her another

letter, stating that "[a] recent review of the lateness record in my office indicates that you have

been late to work," and he attached the DOE's and Foundation's timeliness policies. Pl.'s Resp.

to Def.'s 56.1 Statement ¶ 34. Chioke responded the next day with another letter, in which she

explained that she had been late because a "very icy snow storm" had complicated her commute

from Rockland County. Def.'s Decl. in Supp., Ex. V, ECF No. 31-3 at 124. She wrote that she

believed Molina was upset because of a "Step 1 Grievance that was filed against [him] on [her]

behalf," and she accused Molina of behaving in a "petty and unprofessional" fashion and

demonstrating "bullying attitudes" toward her. *Id.*

Molina resigned in May 2014. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 36. At his

deposition, he testified that he left because "Horowitz was very difficult to work with," as "[s]he

was expecting things that really couldn't be done," such as "turn[ing] a . . . failing school to an A

school." Molina Dep. 29:8–16 (Def.'s Decl. in Supp., Ex. E). He knew that Horowitz might

discontinue him, and he did not want a discontinuance on his record. *Id.* at 29:22–30:3. But

Molina also testified that Horowitz never spoke with him about Chioke and that he didn't believe

his Hispanic identity influenced his treatment. Pl.'s Resp. to Def.'s 56.1 Statement ¶¶ 38, 40.

Following Molina's departure, Neil Monheit became Principal. *Id.* at ¶ 41. Chioke

testified that, on one of his first days on the job, Monheit asked her if she spoke French—

apparently because of her accent—and requested a copy of her degrees. Pl.'s Dep. 128:24–

130:10. Chioke asked another teacher—again, Mr. Ahmed—whether Monheit had made a similar

request of him, and he said no. *Id.* at 130:19–23. Chioke believes she was the only one asked to

supply credentials. *Id.* at 131:3–7.

Soon thereafter, Monheit asked Chioke to start covering Foundations' Saturday school

program. *Id.* at ¶ 46. The program required an administrator's presence, and because Monheit

and Chioke were the only administrators at Foundations, and because Monheit is a Sabbath-

observant Jew, he turned to Chioke to assume responsibility. Pl.'s Dep. 127:12–128:17.

On Friday, June 6, 2014, a problem arose. Chioke learned that her sister was in a coma

and dying, so she asked Monheit that Friday to excuse her from her Saturday responsibilities.

Pl.'s Resp. to Def.'s 56.1 Statement ¶ 47; Pl.'s Dep. 135:18–22. Monheit told her that he would

look for a replacement, but at the end of the day, he told her that he could not find anyone and

that she needed to cover the shift. Pl.'s Dep. 135:22–25. She protested, but he said that he

himself could not come in on a Saturday due to his religious beliefs. *Id.* at 135:25–136:4. As

Chioke puts it, "that was it." *Id.* at 136:4.

So Chioke covered Saturday school, which, because of renovations at Foundations, took

place that day at P.S. 59. *Id.* at 137:9–10; Pl.'s Resp. to Def.'s 56.1 Statement ¶ 47. At some

point, students from Foundations entered the P.S. 59 gym and broke one of the basketball hoops. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 52. According to Chioke, she was in the cafeteria, and the gym should have been locked. *Id.* Chioke tried to find Monheit the following Monday to inform him of the incident, but because she could not locate him, she waited until the next day to tell him. *Id.* at ¶ 53.

Chioke's sister died that Monday. Pl.'s Decl. ¶ 26. She alleges that, three days later, she requested leave to attend the funeral and related events, particularly given that she had family coming from Africa. *Id.* at ¶ 27. But she claims that Monheit told her that she could take only two days off and that she needed to produce a death certificate. *Id.* She further claims that another teacher, who is Hispanic, told her that Monheit did not make a similar request of her when she traveled to the Dominican Republic for a funeral. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 87. Chioke, though, ultimately testified that she believes she took more than two days off for her sister's death. Pl.'s Dep. 153:25–154:5.

Around a week and half after the Saturday-school incident, Monheit arranged "an end of year conference" with Chioke in order to "investigate an allegation of failure to properly supervise Saturday school," as well as to "address a pattern of lateness." Pl.'s Resp. to Def.'s 56.1 Statement ¶ 59; Def.'s Decl. in Supp., Ex. Y (letter dated June 16), Ex. Z (letter dated June 17), ECF No. 31-3 at 136, 138. Monheit also told her that "[b]ecause this conference may lead to disciplinary action, [she] may bring a union representative." Ex. Z.

One day before the scheduled meeting, however, Chioke became involved in another incident. On June 18, she accused two students of being high. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 55. As Chioke relates it, the two students had a "history of coming to school under the influence," and she determined that they looked high that day—a diagnosis she says she was

well trained to make, given her master's in psychology with a specialization in mental health and substance abuse. Pl.'s Dep. 197:13–24. Monheit, however, soon learned that Chioke's accusations against the students were wrong. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 55. In response, Monheit asked Chioke and the two school safety agents involved in the incident to draft statements explaining their conduct. *Id.*

On June 19, Chioke and Monheit—along with Chioke's union representative—met to discuss the Saturday school incident and Chioke's "continued pattern of lateness." *Id.* at ¶ 60. The next day, Monheit issued Chioke two letters memorializing the content of the meeting. In the first, Monheit discussed Chioke's pattern of lateness, identified two dates on which Chioke arrived late, recorded Chioke's proffered reasons for arriving late on those days, explained that her "failure to record [her] fractional lateness for payroll deduction [violated] Chancellor's Regulation C-601," admonished her pattern of lateness as "detrimental to the functioning of our school," and advised her that her "continued pattern of lateness and lack of compliance with Chancellor's Regulations may lead to further disciplinary action, including an unsatisfactory rating and discontinuance of [her] probationary services." Def.'s Decl. in Supp., Ex. BB, ECF No. 31-3 at 142. In the second letter, Monheit discussed the Saturday school incident, documented Chioke's version of what happened, and concluded that, after reviewing all the allegations, Chioke "failed to properly supervise students during the Saturday program," and that her "failure to report the destruction of gym property at PS 59 on direct questioning represents conduct unbecoming a supervisor and misconduct." Def.'s Decl. in Supp., Ex. CC, ECF No. 31-3 at 144–46. Monheit further wrote that Chioke's "responses at the meeting were not credible" and that her description of events did not match the PS 59 principal's report of the incident. *Id.* As in

the first letter, Monheit advised Chioke that the incident may subject her to further disciplinary action. *Id.*

The same day Monheit issued those two letters, he also received a curious email from a DOE employee. The email informed him that Chioke had not logged into the DOE's "Automate the Schools" ("ATS") system since March 24, 2012. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 57. Because DOE administrators use ATS for many common tasks, the employee thought it was "[s]ort of weird that [Chioke] has not been in ATS for over 2 years as an [Assistant Principal]." *Id.* at ¶¶ 56, 57. Chioke claims, however, that she stopped using ATS when Molina had taken away various responsibilities from her during the 2012–13 year. *Id.* at ¶ 58.

Chioke soon experienced more troubles. She alleges that, on June 22, she suffered a "health episode which required emergency care." *Id.* at ¶ 65. As a result, she needed to miss another meeting with Monheit, at which they were going to discuss her accusations of students being high. *Id.* at ¶ 66. On June 24, Monheit issued one more letter to Chioke, in which he concluded that her conduct regarding the allegedly high students—as well as her having reviewed the safety agents' statements before submitting her own statement—"constitutes professional misconduct unbecoming a professional educator." *Id.* at ¶ 67; Def.'s Decl. in Supp., Ex. DD, ECF No. 31-3 at 148–49. Chioke, for her part, maintained at her deposition that her conduct was proper and that, while she helped the agents photocopy their statements, she did not actually review them. Pl.'s Dep. 197:11–200:16.

That same day, Monheit gave Chioke an unsatisfactory performance rating for the 2013–14 year and recommended discontinuing her as probationary Assistant Principal. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 69. Specifically, Monheit wrote:

> Ms. Chioke's performance is below expectations within a framework of operations. She has demonstrated incompetence in supervising guidance

processes. Additionally she has demonstrated incompetence as school building response team leader. An [sic] review of Ms. Chioke's responsibilities reveals she did not provide oversight for the provision of mandated services resulting in students remaining unserved.

Ms. Chioke failed to follow principal directives. A review of Ms. Chioke's performance demonstrates a pattern of lateness and a failure to provide adequate supervision of students, endangering their health, safety and welfare.

Ms. Chioke has demonstrated a lack of awareness of important data systems necessary to perform her duties.

Ms. Chioke had failed to meet three of her stated performance goals.

Ms. Chioke has demonstrated professional misconduct.

Def.'s Decl. in Supp., Ex. EE, ECF No. 31-3 at 155. Horowitz approved Monheit's recommendation, and on June 26, she sent Chioke a letter informing her that she was under consideration for discontinuance and providing her an opportunity to respond. Pl.'s Resp. to Def.'s 56.1 Statement ¶¶ 71, 72. Horowitz reaffirmed her discontinuance on August 6. *Id.* at ¶ 73.

On August 14, Chioke appealed her unsatisfactory rating to the DOE's Office of Appeals & Reviews. *Id.* at ¶ 74. A three-member Chancellor's Committee held a hearing on October 31, at which Chioke, represented by her union advisor, had the opportunity to testify, present evidence, and cross-examine witnesses. *Id.* at ¶ 75. The Committee ultimately "concur[red] with the recommendation to discontinue probationary service," and the Chairperson "recommend[ed] sustaining the 'Unsatisfactory' rating and denying its appeal." Def.'s Decl. in Supp., Ex. II, ECF No. 31-3 at 170. It found:

> The written documentation and verbal testimony provided by [Monheit], former Principal Jimmy Molina and the Superintendent's Representative were relevant and persuasive. It was overwhelmingly clear to the Committee that the Probationer had failed: to meet three (3) of her four (4) supervisory and administrative objectives; to follow the Rating Officer's directives; to consistently arrive at school on time; to effectively supervise guidance counselors or students; or to follow the relevant regulations for student grading and promotion, the reporting of incidents or the ordering of mandated tests. In short, [Monheit] was

perfectly accurate in his assessment that [Chioke] had demonstrated "incompetence, professional misconduct, a failure to protect students" and other "egregious behavior." During the hearing, it was obvious to the Committee that the Probationer was dissembling and disingenuous, and that she was far more likely to place the blame for her own professional failures and misconduct on her supervisors, and even on her sister's death, than on herself. While claiming that her former Rating Officer, Jimmy Molina, revered her and lost his job to protect her, she simultaneously testified that, after Principal Molina had disciplined her for a pattern of lateness . . . , she "began to document his latenesses."

*Id.* In accord with the Committee's recommendation, Horowitz reaffirmed Chioke's discontinuance on November 20, 2014. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 78. Chioke then returned to her previous position as a guidance counselor with the DOE. *Id.* at ¶ 79.

Chioke filed a complaint with the New York State Division of Human Rights, accusing the DOE of unlawful discriminatory practices in violation of New York law. Def.'s Decl. in Supp., Ex. KK, ECF No. 31-3 at 179–83. She also filed a charge of employment discrimination under Title VII of the Civil Rights Act of 1964, which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). *Id.*, Ex. LL, ECF No. 31-3 at 185.

On November 25, 2014, while her administrative complaints were still pending, Chioke commenced an Article 78 proceeding in New York Supreme Court, Kings County, against the DOE, Horowitz, and Monheit, challenging her probationary discontinuance. Notice of Removal, Ex. B, ECF No. 1 at 17. In that same action, Chioke also alleged race and national origin discrimination, retaliation, and a hostile work environment—all pursuant to 42 U.S.C. § 1981. *See id.* at 27–28.

On December 26, 2014, the State Division of Human Rights dismissed Chioke's complaint due to administrative convenience, Def.'s Decl. in Supp., Ex. MM, ECF No. 31-3 at 187, and the EEOC issued Chioke a Dismissal and Notice of Rights on February 24, 2015, *id.*, Ex. NN, ECF No. 31-3 at 190. After the EEOC decision, Chioke and the DOE agreed to

discontinue the Article 78 proceeding and convert the action into one seeking relief under 42 U.S.C § 1981 and Title VII. Stipulation of Discontinuance of Art. 78 Portion of Proceeding, ECF No. 1 at 37.

In March 2015, Chioke served the DOE with an amended complaint, alleging that it discriminated against her on the basis of race and national origin, and retaliated against her, in violation of Title VII. *See* Am. Verified Compl. 7–8, 15. The complaint also alleged that the DOE, as well as Horowitz and Monheit, subjected her to disparate treatment and a hostile school environment, and then retaliated against her, in violation of § 1981. *Id.* at 8–9. To remedy these alleged violations, Chioke demanded compensatory damages, "including but not limited to lost pay and career earnings, pain and suffering, humiliation, irrevocable damage to plaintiff's reputation, depression, and anxiety." *Id.* at 9. She also requested punitive damages; unpaid wages, salary, and employment benefits; reinstatement to her prior position; and reasonable attorneys' fees and costs. *Id.* at 10.

On April 6, 2016, the DOE removed this case. The DOE claims—and at no point has Chioke denied—that it is the only party that has been served in this action. Def.'s Mem. in Supp. of Summ. J ("Def.'s Mem.") 1. After the close of discovery, the DOE moved for summary judgment on all claims.

## Discussion

Summary judgment is required when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), and no genuine dispute exists "[w]here the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On summary judgment, "the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Frito Lay, Inc. v. LTV Steel Co.*, 10 F.3d 944, 957 (2d Cir. 1993)).

Because employment discrimination cases often turn on the employer's intent, which is generally difficult to prove with direct evidence, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer" when intent is at issue. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

I.    *Chioke's Title VII discrimination claim.*

Title VII claims for race and national origin discrimination are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination by showing "that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Id.* at 492. Once the plaintiff establishes a *prima facie* case, "the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination." *Id.* If it does, "the burden returns to the plaintiff to show that the real reason for plaintiff's termination was his race and national origin." *Id.*

In many cases, like this one, "the question of whether the plaintiff has met his *prima facie* burden of demonstrating an inference of discrimination is often indistinguishable from the question of whether the employer's actions served merely as a pretext for some disguised discriminatory animus towards the plaintiff." *Jimenez v. Donahoe*, 968 F. Supp. 2d 609, 618 (S.D.N.Y. 2013). Therefore, "[d]espite the elaborate process set up in *McDonnell Douglas,* Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (citing cases). Indeed, at this point in the case, all the evidence is on the table, and "the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against her." *Goldman v. Admin. for Children's Servs.*, 04–cv–7890 (GEL), 2007 WL 1552397, at *5 (S.D.N.Y. May 29, 2007). Therefore, I will assume, without deciding, that Chioke has a *prima facie* case and proceed to the second and third steps of the *McDonnell Douglas* analysis.

But before doing so, it is important to identify the particular adverse employment actions at issue. The DOE acknowledges that Chioke's unsatisfactory rating and discontinuance "arguably might amount to adverse employment actions." Def.'s Mem. 5. Chioke seemingly suggests that other actions, too, were adverse, including: Molina's advising her on February 12, 2014, that he was "excessing"[1] her from the school, Pl.'s Mem. in Opp. to Summ. J. ("Pl.'s

---

[1] The parties do not define this term. According to the United Federation of Teachers' website, "excessing" occurs "when a school reduces the size of its faculty, such as when it experiences an unexpected drop in student enrollment,

Mem.") 9; Molina's issuing a letter to her file, *id.*; Monheit's requesting her degrees, *id.*; and Monheit's requiring her to cover Saturday school, *id.* at 10. The DOE, however, argues that these other actions were not "adverse employment actions." It is correct.

An adverse employment action, for the purpose of a Title VII discrimination claim, requires a "materially adverse change in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). The change "must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities,'" *id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)), which "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Chioke's discontinuance, along with her unsatisfactory rating triggering it, meets this standard, but the various letters issued to her file do not. *See, e.g.*, *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012); *Fox v. New York City Dep't of Educ.*, 13–cv–3204 (VEC), 2015 WL 4991878, at *9 (S.D.N.Y. Aug. 20, 2015) ("The letters-to-file here—like those in *Sotomayor*—did not carry specific consequences with them."). Additionally, there is no evidence that Monheit's and Molina's other conduct toward Chioke effected any "materially adverse change" in the terms and conditions of her employment. Accordingly, for the purpose of Chioke's Title VII discrimination claim, the only relevant adverse actions are her discontinuance and unsatisfactory rating.

---

loses a budget line or is being closed, redesigned or phased out." *Excessing*, United Federation of Teachers (June 13, 2012), www.uft.org/know-your-rights/excessing. However, "it is quite different from a layoff or a firing," and various contractual rules govern the treatment of excessed teachers. *Id.*

A. <u>The DOE has presented legitimate, nondiscriminatory reasons for its actions.</u>

The DOE has produced evidence of several legitimate, nondiscriminatory reasons for the adverse employment actions it took. Under Chioke's watch, the school's attendance rates suffered, and she was late in submitting documents requested by her superior. The Chancellor's Committee found that she failed to meet three out of her four supervisory and administrative objectives. Moreover, Monheit learned that Chioke had not been using the DOE's data system for over two years. And she erroneously accused two students of being high. Indeed, by the time she received her unsatisfactory rating and discontinuance, Chioke had received critical performance reviews—through both letters and in-person meetings—from two separate principals. In sum, Chioke's supervisors believed she was an ineffective administrator. That is sufficient to shift the burden to Chioke to demonstrate pretext. *See Sotomayor*, 862 F. Supp. 2d at 258–59.

B. <u>Chioke fails to establish pretext.</u>

Chioke must show that the DOE's legitimate, nondiscriminatory reasons are pretextual, and that her race or national origin "played a role in the adverse actions." *Weber v. City of New York*, 973 F. Supp. 2d 227, 255 (E.D.N.Y. 2013); *see also Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015). She fails to meet this burden.

Chioke points to the following so-called "direct evidence of discrimination":

- Her declaration stating that, after Horowitz first visited Foundations in spring 2012, Molina told Chioke that "Horowitz did not like minorities," "that it was his 'firm belief that [Horowitz] is a racist,'" and "that if Ms. Horowitz remains Superintendent, we are gone." Pl.'s Decl. ¶ 9; Pl.'s Mem. 6.

- Her declaration stating that, on September 9, 2012, Molina warned her "to look for work as an A.P. (Assistant Principal) elsewhere" and that "[Horowitz] doesn't think you should be an A.P. because you are African." Pl.'s Decl. ¶ 10; Pl.'s Mem. 6.

- Her February 3, 2014, letter to Molina, in which she wrote that he told her during their November 27, 2013, meeting that Horowitz wanted to fire her because of her race, that Horowitz is "just a plain racist," and that "she says the worst things about all the black teachers and find [sic] everything nice to say about the white teachers." Def.'s Decl. in Supp., Ex. T; Pl.'s Mem. 6.

- Mansur Ahmed's declaration that Molina had told him on multiple occasions that Horowitz wanted Chioke removed, that Horowitz "does not like Africans and black people," and that "it was [Molina's] opinion that based on these conversations with her that Ms. Horowitz was a racist." Ahmed Decl. ¶¶ 4, 5; Pl.'s Mem. 6–7.

- Ahmed's declaration that Molina "requested that I ask [Chioke] to resign since Ms. Horowitz expressed the opinion to Mr. Molina that she wanted Chioke out as the Assistant Principal position." Ahmed Decl. ¶ 6; Pl.'s Mem. 7.

- Ahmed's declaration that "when it was apparent that Ms. Chioke was not going to resign, I was specifically instructed by Mr. Molina not to listen to Ms. Chioke and not to speak to her unless absolutely necessary." Ahmed Decl. ¶ 7; Pl.'s Mem. 7.

Summed up, Chioke relies on her and Ahmed's statements that Molina told them that he thinks Horowitz—the superintendent who ultimately signed off on her discontinuance—is a racist and, as such, wanted Chioke removed because she is black and African. The DOE argues that these statements are hearsay. Chioke contends that they are not, because they were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). But regardless of whether they are hearsay, the statements amount to nothing more than speculation, which "is insufficient to support an inference of discrimination at the summary judgment stage." *Sacks v. Gandhi Eng'g, Inc.*, 999 F. Supp. 2d 629, 644 (S.D.N.Y. 2014). As the Second Circuit has made clear, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). Chioke and Ahmed do not point to any specific conduct suggesting that Horowitz harbors racial animus. Rather, they rely on Molina's alleged statements that he thinks Horowitz is a racist, that she does

not like blacks and Africans, and that she wanted Chioke fired because of her race and national origin. Such testimony is "devoid of any concrete particulars and wholly conclusory." *Id.*; *see also Tolbert v. Smith*, 790 F.3d 427, 437 n.7 (noting that a witness's "testimony that she believed [defendant's] decision to deny tenure was based on race is mere speculation" (internal quotations and alteration omitted)). This is all the more so with respect to Chioke's unsatisfactory rating. Recall that it was *Monheit* who gave it, and Chioke has provided no evidence that Horowitz played any role in that decision, beyond her simply being the school's superintendent.

Chioke's so-called "direct evidence" of discrimination is thus insufficient to meet her burden. This is also true of Chioke's litany of "circumstantial evidence of discrimination and retaliation," Pl.'s Mem. 8–16, most of which consists of various actions taken by Molina and Monheit, including:

- Molina's relieving Chioke of administrative duties and instructing other teachers not to listen to her regarding any policies, plans, or strategies for the school. *Id.* at 8.

- Molina's issuing her a letter on February 6, 2014, admonishing her for arriving late during a snowstorm, even though "numerous other teachers experienced similar delays." *Id.* at 9.

- Monheit's ordering her, but not other Foundations staff, to bring copies of her academic degrees to him. *Id.*

- Monheit's forcing her to cover Saturday school on June 6, 2014, when her sister was in a coma and dying. *Id.* at 10.

- Monheit's telling her, when she requested leave to attend her sister's funeral, that she was permitted only a two-day leave and needed to present a death certificate. *Id.* at 11.

As an initial matter, the evidence concerning Molina is irrelevant because the adverse employment actions at issue were taken by Monheit and, with respect to the discontinuance, rubber-stamped by Horowitz. Chioke has provided no evidence that Molina "played a

meaningful role" in these actions. *Holcomb*, 521 F.3d at 143. More importantly, Chioke cannot simply "cite to [her] mistreatment and ask the court to conclude that it must have been related to [her] race." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001). To prevail on summary judgment here, she must provide evidence that she suffered the adverse employment actions *because of her race or national origin*, not just that she was treated poorly or unfairly. *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 581 (S.D.N.Y. 2011). None of her "circumstantial evidence," however troublesome, meets that standard.

Perhaps the only statement made to Chioke remotely related to her race or national origin was Monheit's allegedly asking her if she spoke French and, when asked why that was relevant, explaining that he could not understand her because of her accent. Pl.'s Mem. 9. But having trouble with a person's foreign accent on one occasion—especially in the absence of other evidence—hardly suggests discriminatory animus.

In an attempt to situate her discontinuance within a larger pattern of race-based decisionmaking, Chioke also notes that Monheit testified to discontinuing two other employees, both of whom also happen to be African American. Pl's Mem. 15. But this evidence does not prove that Chioke's discontinuance conformed to a general pattern of discrimination. Chioke has not shown—nor do I see—how this evidence is statistically significant. *Cf. Ottaviani v. State Univ. of New York at New Paltz*, 875 F.2d 365, 370–71 (2d Cir. 1989) ("[P]laintiffs in a disparate treatment case frequently rely on statistical evidence . . . to argue that . . . disparities exist because of an unlawful bias . . . . Not all disparities, however, are probative of discrimination. Before a deviation from a predicted outcome can be considered probative, the deviation must be 'statistically significant.'"). Indeed, Monheit also testified, without dispute, to discontinuing

another, non-black educator, and to giving a black guidance counselor a positive rating. *See* Monheit Dep. 14:21–22, 15:3–24; Pl.'s Mem. 8.

Finally, Chioke argues that Monheit's terminating her after supervising her for a little more than a month shows discrimination, particularly when she had two prior satisfactory performance evaluations. Pl.'s Mem. 15. This argument is unconvincing. A lot can—and did— happen in such a timeframe to convince a principal that an employee is incompetent. Moreover, it is fair to assume Monheit had access to Chioke's file and could therefore base his decision on far more than just a month's worth of interactions.

Not only has Chioke failed to produce sufficient evidence of pretext, other evidence in the record belies the notion that Horowitz harbored any racial animus. Chioke admits that in January 2013, while Horowitz was in charge, she was appointed probationary Assistant Principal. Pl.'s Resp. to Def.'s 56.1 Statement ¶ 22. Chioke further admits that, in July 2013, Horowitz approved her continuing on as Assistant Principal. *Id.* at ¶ 24. "It is difficult to impute bias against a plaintiff in a protected class where the person making the adverse employment decision also made a recent favorable employment decision regarding the plaintiff." *Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 233 (E.D.N.Y. 2009); *see also Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

What's more, a unanimous three-member panel of the DOE's Office of Appeals and Reviews reviewed and recommended Chioke's unsatisfactory rating and discontinuance. Def.'s Decl. in Supp., Ex. II. Chioke calls this "internal grievance" process a "sham," arguing that "the decisionmaker on the grievance is Ms. Horowitz . . . and the committee are employees of the Defendant." Def.'s Mem. 15. But Horowitz was not a member of the three-member panel. Ex. II.

Moreover, while the Office of Appeals and Reviews is a subdivision of the DOE, there is no evidence that the committee was in cahoots with Molina, Monheit, or Horowitz.

In sum, on the evidence in this record, no reasonable juror could conclude that the DOE discriminated against Chioke on the basis of her race or national origin. Her Title VII discrimination claim fails.

II.    *Chioke's Title VII retaliation claim.*

Like they do with discrimination claims, courts also evaluate Title VII retaliation claims under the *McDonnell Douglas* burden-shifting regime. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001). To repeat, the plaintiff must first set forth a *prima facie* case; the burden then shifts to the defendant to offer a legitimate reason for the actions it took; and then the burden shifts back to the plaintiff to demonstrate pretext. *Id.* at 94–95.

To establish "a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). The Supreme Court has made clear "that Title VII's substantive provision and its antiretaliation provision are not coterminous," and that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). At the same, a plaintiff alleging retaliation must show "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The only protected activity at issue is Chioke's letter sent on February 3, 2014, in which she complained about discrimination and threatened to report it to the EEOC. *See* Pl.'s Mem. 5. Chioke claims that, in retaliation for that letter, she suffered the following adverse actions: Molina's issuing her a letter on February 6, notifying her of a record of lateness, *id.*; Molina's advising her on February 12 that he was excessing her from the school, *id.* at 9; Monheit's requiring her to cover Saturday school on June 7, *id.* at 10; Monheit's requesting a death certificate before approving her bereavement leave for her sister, *id.* at 11; and her ultimate discontinuance, *id.* at 15. I will address each in reverse order.

A.  Her ultimate discontinuance.

With respect to her ultimate discontinuance, Chioke fails to show causation. Pursuant to *Nasser*, Chioke must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. at 360. Here, Chioke was discontinued at the end of June, almost five months after her February 3 letter. *Cf. Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990) (suggesting no causal nexus when there was a three-month interval between the protected activity and the alleged retaliation). And in the interim (as well as prior to February 3), Chioke was involved in a number of incidents that cast significant doubts on her ability to effectively perform her job. Moreover, Chioke's February 3 letter was largely directed at *Molina*, and it was *Monheit*—who had yet to join the school— who recommended Chioke's discontinuance based on his own interactions with her. Chioke has thus "failed to present sufficient evidence from which a reasonable jury could conclude 'that the desire to retaliate was the but-for cause'" of her discontinuance. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73 (2d Cir. 2015) (quoting *Nasser*, 570 U.S. at 352).

B.  Monheit's other actions.

Chioke fails to state a *prima facie* claim of retaliation with respect to Monheit's other conduct—namely, his requiring her to cover Saturday school and his requesting a death certificate before approving her bereavement leave. First, these were not *materially* adverse actions. For the purposes of a Title VII retaliation claim, a "materially adverse action" is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington Northern*, 548 U.S. at 57). "[P]etty slights, minor annoyances, and simple lack of good manners" are not material adverse actions. *Burlington Northern*, 548 U.S. at 68. But "[c]ontext matters," and, while materiality is an objective standard, "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. In brief, the "inquiry is highly fact-specific." *Vazquez v. Southside United Hous. Dev. Fund Corp.*, 06-CV-5997(NGG)(LB), 2009 WL 2596490, at *13 (E.D.N.Y. Aug. 21, 2009).

Monheit's requiring Chioke to administer Saturday school, and his requesting a death certificate, were not materially adverse actions. While covering Saturday school could fairly be called annoying, it was not unreasonable to ask a school administrator to do so, particularly when paid for the extra work. *See* Pl.'s Dep 127:12–15. Such an assignment would not deter a reasonable administrator from exercising her statutory rights. The request for a death certificate, likewise, could also be called irritating, but again, "petty slights, minor annoyances, and simple lack of good manners will not" deter discrimination complaints. *Burlington Northern*, 548 U.S. at 68.

Second, Chioke has not demonstrated that her February 3 letter—written to *Molina*—was the but-for cause of *Monheit*'s conduct. Indeed, other, independent reasons explain Monheit's

actions: the need for an administrator to cover Saturday school given Monheit's unavailability, and the school's policies regarding bereavement leave. Put differently, the alleged adverse actions would still "have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

    C.   <u>Molina's advising Chioke that he was excessing her from the school.</u>

Chioke argues that Molina retaliated against her by advising her on February 12, 2014, that he was excessing her from the school. But according to her own testimony, Molina did not personally tell Chioke this; rather, she claims that her union representative told her that Molina said that he was excessing her. Pl.'s Dep. 125:3–21. And Chioke also admits that she never was excessed. *Id.* at 125:18–21. On this evidence, even assuming Molina told the union representative that he would be excessing Chioke, his conduct amounts to nothing more than an "empty verbal threat[]," which does not constitute a materially adverse action where, as here, it is "unsupported by any other actions." *Vazquez*, 2009 WL 2596490, at *12; *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (holding that an alleged "threat of termination" that "was never carried out" was not materially adverse).

    D.   <u>Molina's February 6 letter.</u>

Molina's February 6 letter—which formally noted her lateness in arriving to school—presents the closest call. In it, Molina wrote:

> A recent review of the lateness record in my office indicates that you have been late to work. In addition to the possibility of payroll deduction at the end of the year . . . continued lateness and/or failure to sign the late book may result in being placed on a time card and unfavorable rating.

Def.'s Decl. in Supp., Ex. U.

Contrary to the DOE's assertions, *see* Def.'s Mem. 14, a reasonable jury could find that this letter was a materially adverse action, even if it did not qualify as such in the discrimination

context, *see Hicks*, 593 F.3d at 165 (explaining that Title VII's anti-retaliation protection is broader than its anti-discrimination provisions). An employer's formal reprimand, the Second Circuit instructed in *Millea v. Metro-North Railroad Company*, 658 F.3d 154 (2d Cir. 2011), "is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy." *Id.* at 165. Consequently, per *Millea*, a reasonable jury could find that a letter is materially adverse, "even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently." *Id.*; *see also Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 227–28 (E.D.N.Y. 2014). The February 6 letter, which Chioke alleges was placed in her file, formally admonished her for arriving late to work, without specifying any dates of lateness. When asked at his deposition why he did not specify any dates, Molina explained that the letter was "more of a warning . . . saying that the next lateness will be deducted." Molina Dep. 32:11–14. Under these circumstances, *Millea* compels me to conclude that a reasonable jury could find the letter to be a materially adverse action. Moreover, the three-day gap between Chioke's protected activity and Molina's February 6 letter "is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity." *Zann Kwan*, 737 F.3d at 845. Chioke can thus make out a prima facie case of retaliation with respect to Molina's February 6 letter.

Accordingly, the burden shifts to the DOE to demonstrate a legitimate, nonretaliatory reason for that letter. It has not done so. *See* Def.'s Mem. 13–15. Indeed, even if the letter can be chalked up to Chioke's tardiness, Chioke has produced sufficient evidence of pretext. In a letter Chioke wrote the next day, she explained that she arrived late due to "a very icy snow storm."

Def.'s Decl. in Supp., Ex. V. She even attached an email notification from the Department of Transportation, sent on February 6, suspending alternate side parking the next day to facilitate snow removal. *See id.* Chioke further declared that, "while numerous other teachers experienced similar delays," only she was written up for lateness. Pl.'s Decl. ¶ 17. And as an administrator, Chioke would have been in a position to know personally who was late and who was disciplined. Given this evidence, especially construed in the light most favorable to Chioke, a reasonable jury could conclude that, but for Chioke's protected activity, Molina would not have issued her that February 6 letter. *See Zann Kwan*, 737 F.3d at 846 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.").

To be sure, prior to the protected activity, Molina had already criticized Chioke's management of school attendance, both in emails and in a letter to her file. In fact, when he asked Chioke to meet with him to discuss Foundations' low attendance rates, Molina strongly suggested she bring along union representation, indicating that she faced potentially serious disciplinary actions. And after that meeting—again, before Chioke engaged in any protected activity—he called out Chioke's "poor leadership qualities" and warned her that she could face additional disciplinary actions, including an unsatisfactory rating. In short, Chioke was skating on very thin ice. But in light of all the evidence presented, I cannot confidently say that *no* reasonable jury could find that, absent the retaliatory animus, Molina still would have issued the February 6 letter. Up to this point, Molina had never formally disciplined Chioke for tardiness, and her late arrival during a snowstorm was an odd reason to do so, especially when she

commuted from Rockland County to Brooklyn via a bus and three trains. Pl.'s Dep. 110:9–18. The letter itself points to no other specific instances of lateness, and the defendants have not identified any. On these facts, summary judgment is inappropriate. *See Zann Kwan*, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a 'but—for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.").

* * *

In sum, Chioke's only viable Title VII retaliation claim is with respect to Molina's February 6 letter. Granted, it appears that Chioke suffered little damage, if any, from receiving it. Nonetheless, with respect to that letter, a reasonable jury could find that she has met all the elements of a retaliation claim. With respect to any of the other allegedly adverse actions— including her discontinuance—her retaliation claim fails.

III.    *Chioke's hostile work environment claim.*

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In evaluating hostile work environment claims, courts "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 321 (quoting *Harris*, 510 U.S. at 23). This is both an objective and a

subjective inquiry; that is, "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).

Chioke argues that the following specific incidents contributed to a hostile work environment: Monheit "requesting she bring in her credentials"; "Monheit commenting on her accent"; her "not being able to take time off to see her dying sister who was in a coma"; and her "having to struggle to get time off to attend her sister's funeral." Pl.'s Mem. 17–18. She also points to "other conduct directed at her as set forth in the Circumstantial Evidence Section of [her] memorandum of law." *Id.* at 18. Except for the comment relating to Chioke's accent, however, all of these incidents are race-neutral and unrelated to her national origin. While "[f]acially neutral incidents may be included . . . among the 'totality of circumstances' that courts consider in any hostile work environment claim," there must still be "some circumstantial or other basis for inferring that [such] incidents . . . were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). Because no such basis exists here, nearly all of the incidents "must be excluded from consideration." *Id.* at 377.

That leaves Monheit's comment about Chioke's accent. Although "a single episode of harassment, if severe enough, can establish a hostile work environment," *Torres v. Pisano*, 116 F.3d 625, 631 n.4 (2d Cir. 1997), Monheit's comment does not. As Chioke recounts it, Monheit told her that "because of her accent, he could not understand her." Pl.'s Mem. 9. Construed in the light most favorable to Chioke, this comment was rude and perhaps offensive. But standing alone, it was not "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Boza–Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535,

547 (W.D.N.Y. 2016) ("Vague allegations that co-workers made fun of her accent in connection with Plaintiff's pronunciation of streets, with no additional supporting factual information as to the context and frequency of this conduct, . . . do not plausibly allege conduct that is sufficiently severe so as to alter the terms and conditions of Plaintiff's employment."). Chioke's hostile work environment claim fails.

IV.    *Chioke's § 1981 claims.*

As the DOE correctly argues, "§ 1981 does not provide a separate private right of action against state actors." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). Accordingly, § 1981 cannot provide Chioke any relief against the DOE. Moreover, even had Chioke sued the DOE under § 1983, *see Hill v. City of New York*, 136 F. Supp. 3d 304, 330 (E.D.N.Y. 2015), the DOE would be immune from suit under *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978), as Chioke has not shown "that the challenged acts were performed pursuant to a municipal policy or custom," *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004), *superseded in part on other grounds by* Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071.

## Conclusion

The DOE's summary judgment motion is granted in part and denied in part. Summary judgment is granted for all claims, except for Chioke's retaliation claim with respect to Molina's February 6 letter alone.

**SO ORDERED.**

Brooklyn, New York
June 25, 2018

*Edward R. Korman*
Edward R. Korman
United States District Judge